UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| PHYSIOTHERAPY ASSOCIATES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 1:06-CV-22-TS |
| ) | |
| SEAN WHITE, ANDREW HARRY, ) | |
| KATHY CHAIRS, PEAK PERFORMANCE ) | |
| ORTHOPEDIC & SPORTS PHYSICAL ) | |
| THERAPY, P.C., ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

The Plaintiff, Physiotherapy Associates, Inc., sued three of its former employees and Peak Performance Orthopedic & Sports Therapy, P.C., for violations of Indiana state law. The Plaintiff also moved for a preliminary injunction against the Defendants.

**BACKGROUND**

The Plaintiff operates a physical therapy clinic in Columbia City, Indiana. On January 20, 2006, the Plaintiff filed its Verified Complaint for Preliminary Injunction, Damages and Other Relief. The Plaintiff also filed a Motion for Preliminary Injunction. The Plaintiff invoked the Court's jurisdiction under 28 U.S.C. § 1332, asserting diversity of citizenship and damages greater than $75,000. The Plaintiff stated that the individual Defendants, Sean White, Andrew Harry, and Kathy Chairs were its former employees. White was the clinical director, Harry was a staff physical therapist, and Chairs was the business manager. The Plaintiff initiated the lawsuit after the individual Defendants began working for a competing business, Peak Performance Orthopedic & Sports Physical Therapy.

**A. Complaint Allegations**

The Complaint alleges that on or about November 30, 2005, Chairs submitted a letter of resignation to White. The letter provided thirty days notice, as required by the Plaintiff's policy, and noted Chair's desire to stay home with her children as the reason for resignation. Chairs worked for another thirty days before leaving the Plaintiff's employment. On December 30, 2005, Harry gave his thirty-day notice. On January 2, White tendered a letter of resignation dated December 30 to Brian Burt, the group director for certain of the Plaintiff's clinics, including the one in Columbia City. Both Harry and White's letters were delivered to Burt at his home on January 2. White informed Burt that he was starting a physical therapy clinic, named Peak Performance Orthopedic & Sports Physical Therapy, in Columbia City that would perform the same services as the Plaintiff. White would perform the same services for Peak Performance that he performed for the Plaintiff. White told Burt that he had been working on opening his clinic for about six months and that Harry and Chairs would also be working at the clinic. White informed Burt that the new clinic was scheduled to open the next morning, January 3. He solicited Burt for a position with Peak Performance but Burt declined the offer.

The Plaintiff released Harry from the thirty-day notice requirement and made his resignation effective January 3, 2006. It did the same for White.

On January 3, 2006, an employee of the Plaintiff informed it that White and Harry had been overheard telling patients at the clinic that they were going to open a new clinic and soliciting the patients to come to the new facility.

During his employment with the Plaintiff, White was provided a computer. The Plaintiff

examined the computer after White left and discovered that he had visited websites helpful to opening a new clinic. These included websites with information on billing systems, ordering business apparel, and obtaining Medicare approval. The Plaintiff was also informed that White met with Attorney Tim Bloom several times during his employment under the pretense of redoing his will. Records from the Secretary of the State of Indiana reveal that White incorporated Peak Performance on September 9, 2005, while still employed by the Plaintiff. On November 28, he changed the name and filed Articles of Acceptance. The Plaintiff believes that because Peak Performance was ready to open a day after White and Harry resigned, most, if not all, of the work required to prepare for the opening was done while they were still employed by the Plaintiff.

In December 2005 and early January 2006, a disproportionately large number of patients were discharged from the Plaintiff's clinic, many stating their desire to transfer to another facility as the reason for discharge. The Plaintiff is serving its remaining clients by rotating physical therapists from its other clinics.

**B. Causes of Action**

In Count 1, the Plaintiff's allege that the individual Defendants breached their duty of loyalty to the Plaintiff by soliciting employees for their new clinic, using company-owned computers to conduct research necessary to form the competing clinic, and taking substantial steps to form a competing clinic while still employed by the Plaintiff.

Count 2 asserts a claim for misappropriation of trade secrets as that term is defined under the Indiana Trade Secrets Act, Ind. Code § 24-2-3-2. The trade secrets at issue include the Plaintiff's patient list and referral sources. The Plaintiff alleges that White and Harry misappropriated the

Plaintiff's patient list and referral sources by soliciting its patients on the Plaintiff's premises during treatment and while White and Harry were employed by the Plaintiff. The Plaintiff requests an order requiring the Defendant to refrain from treating or soliciting any former patients of the Plaintiff that the Defendant treated while employed by the Plaintiff.

In Count 3, the Plaintiff alleges that White and Harry interfered with, or attempted to interfere with, existing and prospective business relationships between the Plaintiff and its patients. This interference includes forming a competing business and soliciting patients to the new clinic while still being employed by the Plaintiff.

The Plaintiff's fourth cause of action is a claim for fraud or constructive fraud against Chairs for misrepresenting the reason for her resignation. The Plaintiff contends that had Chairs stated her true intention to work for a competing clinic, it would have waived the thirty-day notice requirement and made her resignation effective immediately. Instead, Chairs was able to assist and coordinate with White and Harry for an additional thirty days and keep the Defendants' plans to open a competing clinic a secret.

Count 5 is a claim for violation of 844 Indiana Administrative Code § 6-7-2(t), for White and Harry's solicitation of patients who had not initially contacted them.

**C. Requested Relief**

The Plaintiff requests a preliminary injunction restraining and enjoining the Defendants from soliciting or servicing patients who were previously, or are currently, patients of the Plaintiff's clinic and from owing, operating, being employed by, or being associated with a clinic that competes with the Plaintiff's Clinic for a period of time equal to at least the time that the Defendants made plans

4

and took steps to open a competing clinic while employed by the Plaintiff. The Plaintiff also requests an order to immediately identify all of the Plaintiff's current or prospective patients whom the Defendants solicited, marketed to, or otherwise had contact with. In addition, the Plaintiff requests damages, punitive damages, reasonable attorney fees, and costs.

## MOTION TO DISMISS

On January 25, 2006, the Defendants filed a Motion to Dismiss [DE 8] Count 2 of the Verified Complaint for failure to state a claim upon which relief can be granted under Indiana's Trade Secrets Act. The Defendants also argue that the alleged damages do not exceed $75,000, exclusive of interest and costs, and the Complaint should be dismissed in its entirety for lack of jurisdiction. The Motion to Dismiss has been fully briefed.

**A. Standard of Review**

*1. Subject Matter Jurisdiction—12(b)(1)*

A case may be dismissed under Federal Rule of Civil Procedure 12(b)(1) when the court lacks jurisdiction over the subject matter. "Subject-matter jurisdiction is the first question in every case, and if the court concludes that it lacks jurisdiction it must proceed no further." *Illinois v. City of Chicago*, 137 F.3d 474, 478 (7th Cir.1998).

When considering a motion to dismiss for lack of subject matter jurisdiction, a court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698, 701 (7th Cir. 2003). The movant may also use affidavits and other material to support its motion if the complaint is formally

5

sufficient but the contention is that there is in fact no subject matter jurisdiction. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003). The presumption of correctness accorded to a complaint's allegations falls away on the jurisdictional issue once a defendant proffers evidence that calls the court's jurisdiction into question. *Id.* at 856. The plaintiff has the obligation to establish jurisdiction by competent proof. *Sapperstein v. Hager*, 188 F.3d 852, 855–56 (7th Cir.1999).

### 2. Failure to State a Claim—12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint and not the merits of the suit. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). The court presumes all well-pleaded allegations to be true and views them in the light most favorable to the plaintiff, and accepts as true all reasonable inferences to be drawn from the allegations. *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995). In order to prevail, the defendant must demonstrate that "the plaintiff's claim, as set forth by the complaint, is without legal consequence." *Gomez v. Ill. State Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987). A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Doherty v. City of Chicago*, 75 F.3d 318, 322 (7th Cir. 1996). Under the Federal Rules of Civil Procedure the plaintiff need only "set out in [his] complaint a short and plain statement of the claim that will provide the defendant with fair notice of the claim." *Scott v. City of Chicago,* 195 F.3d 950, 951 (7th Cir.1999); Fed. R. Civ. P. 8(a). However, a plaintiff may not avoid dismissal simply by attaching bare legal conclusions to narrated facts that fail to support his claims. *Strauss v. City of Chicago*, 760 F.2d 765,

6

767–68 (7th Cir. 1984); *Sutliff, Inc. v. Donavan Cos.*, 727 F.2d 648, 654 (7th Cir. 1984). The complaint must allege facts that sufficiently set forth the essential elements of a cause of action. *Lucien v. Preiner*, 967 F.2d 1166, 1168 (7th Cir.1992); *see also Gray v. County of Dane*, 854 F.2d 179, 182 (7th Cir.1988) (holding that the federal rules require that a complaint allege facts that, if proven, would provide an adequate basis for each claim). The court may consider all allegations made in the complaint as well as any attachments accompanying the complaint. Fed. R. Civ. P. 10(c).

**B. Diversity Jurisdiction—Amount in Controversy**

Jurisdiction based on diversity exists if the amount in controversy exceeds $75,000, exclusive of interest and costs, and the suit is between citizens of different states. *See* 28 U.S.C. § 1332(a)(1). The Defendants argue that dismissal is appropriate because the amount in controversy does not exceed $75,000.

Where an action seeks injunctive or declaratory relief, the amount in controversy for such a request for relief is measured by the value of the object of the litigation. *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977). In this circuit, the test for determining the amount in controversy is the pecuniary result to either party which the judgment, or injunctive relief, would directly produce. *McCarty v. Amoco Pipeline Co.*, 595 F.2d 389, 393 (7th Cir. 1979) (referred to as the "either viewpoint" rule). In other words, when a plaintiff requests an injunction, the amount in controversy may be measured by either the benefit to the plaintiff from an injunction or the burden on the defendant of complying with the requested injunction.

The Defendants contend that the amount in controversy does not exceed $75,000 because

7

only twenty of the Plaintiff's previous patients transferred their care to Peak Performance and the estimation of their gross treatment charges through January 20 (when the Complaint was filed) is $22,800. Using each client's expected discharge dates, and making insurance contract adjustments at forty-five percent, the Defendants arrive at gross estimated charges of $41,565 and net estimated patient receipts of $18,704.25. The Defendants also argue that the Plaintiff is not entitled to consider the value of any injunction enjoining the Defendants from employment in their chosen field because there is no basis in law for this requested relief.

The Plaintiff counters that it is not seeking to enjoin the Defendants from treating the twenty patients, but rather, is seeking to enjoin the Defendants from competing for a period of time equal to when they were secretly planning to compete with the Plaintiff, while still employed by the Plaintiff. The Plaintiff contends that its harm is not limited to the treatment of these patients, but is more far reaching. It also maintains that the Defendants' arguments ignore the value of making a seamless transition from employing the Defendants to competing with them:

> because of their breach of the duty of loyalty to [the Plaintiff] the Defendants were able to resign and then to immediately (the next day) operate a competing clinic, depriving [the Plaintiff] not only of its customers but also of its employees, and not allowing [the Plaintiff] the opportunity to solicit and/or try to win back its patients or referral sources.

(Resp. at 11.)

The Court finds that the appropriate injunction in this case, if any, would prevent the Defendants from soliciting known patients and employees of the Plaintiff for length of time sufficient to allow the Plaintiff to hire and train new employees and contact existing patients and referral sources. However, the facts alleged in the Complaint do not entitle the Plaintiff to an injunction prohibiting the Defendants from operating their business. The cases cited by the Plaintiff

in support of injunctive relief for breaches of the duty of loyalty support this finding.

The Plaintiff cites *Potts v. Review Board of the Indiana Employment Security Division*, 475 N.E.2d 708, 712 (Ind. Ct. App. 1985). This case does not support the Plaintiff's claim for injunctive relief. In fact, the court noted that while former employers often ask for injunctive relief restraining further operation of the employees' newly-formed competing entity, "generally courts recognize the spirit of free enterprise and the importance of vigorous competition in our society" when denying such injunctive relief. *Potts*, 475 N.E.2d at 712. The Plaintiff also cites *In re Uniservices, Inc.*, 517 F.2d 492, 497 (7th Cir. 1975), but this case does not even discuss remedies available for breach of the duty of loyalty. In *Davis v. Eagle Products, Inc.*, 501 N.E.2d 1099, 1104 (Ind. Ct. App. 1987), the court upheld the trial court's finding that a former employee breached his fiduciary duty to his employer by soliciting employees while still employed. However, the only relief awarded in the case was compensatory damages for lost profits. *Id.* at 1108.

The Plaintiff also cites to case law outside Indiana. But even these cases do not support its position regarding injunctive relief to restrain the Defendants from competing against it. In *United Board & Carton Corp. v. Britting*, 164 A.2d 824 (N.J. Super. Ct. 1959), the court restrained the defendants for a period of two years *"from soliciting or doing business with those customers whom they sold*, while working for the plaintiff." *Id.* at 833 (emphasis added). In *Sanitary Farm Dairies, Inc. v. Wolf*, 112 N.W.2d 42, 50 (Minn. 1961), the court held that the defendant engaged in unfair competition, and that the trial court should have determined what customers were affected by the unfair competition and should have enjoined defendants "from soliciting or doing business *with such customers* until plaintiff had an adequate opportunity to do its own soliciting." (emphasis added). *Rego Displays, Inc. v. Fournier*, 379 A.2d 1098, 1102 (R.I. 1977), also cited by the Plaintiff, does

9

not support the type of injunction the Plaintiff requests. The injunction against solicitation in that case only applied to the plaintiff's customers—which the defendant had solicited while still employed by the plaintiff.

> [A] reasonable duration for an injunction against solicitation was determined to be the length of time necessary for the former employer to put himself back in a position to compete on an equal basis. He should have the opportunity to train someone to replace his former employee and to solicit customers once again in open and fair competition.

379 A.2d at 1102.

Taking the Complaint's allegations as true, a similar injunction may be appropriate in this case. However, a prohibition on competition in general is not supported by the Complaint or any of its reasonable inferences.

The Plaintiff presents evidence regarding the value of a six-month injunction prohibiting the Defendants from competing against it. The Plaintiff has not established what the pecuniary value of an injunction against solicitation of the Plaintiff's patients and employees would be. Neither do the parties discuss in their briefs to this Court regarding the amount in controversy the amount of any monetary damages or take into account that the Plaintiff may be entitled to disgorge the Defendants of the salaries they received from the Plaintiff during time they planned and took steps to open a competing clinic while employed by the Plaintiff. *See Wenzel v. Hopper & Galliher*, 830 N.E.2d 996 (Ind. Ct. App. 2005) (discussing disgorgement remedy). The Plaintiff raises this form of equitable relief for the first time in its Brief in Support of its Motion for Preliminary Injunction. Thus, the Plaintiff does not provide the value of this particular remedy.

The Plaintiff has not met its burden to establish that the amount in controversy exceeds $75,000. However, because the value of any injunction, damages, and disgorgement may exceed the

$75,000 threshold amount and the parties are prepared to present evidence on this issue at a preliminary injunction hearing, the Court will withhold ruling on its jurisdiction over this case until that hearing. The Plaintiff will be given an opportunity to establish jurisdiction before presenting evidence on the merits of their motion for a preliminary injunction.

**C. Indiana Trade Secrets Act**

The Defendants argue that the claim that they misappropriated customer lists and referral sources by soliciting the Plaintiff's patients while employed by the Plaintiff does not state an independent cause of action under the Indiana Uniform Trade Secrets Act (IUTSA). This Court agrees.

The IUTSA prohibits the misappropriation of trade secrets. Under the IUTSA, both actual or threatened misappropriation of trade secrets may be enjoined. Ind. Code § 24-2-3-3. "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" Ind. Code § 24-2-2. "Misappropriation" means:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:
> (A) used improper means to acquire knowledge of the trade secret;
> (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
> (i) derived from or through a person who had utilized improper means to acquire it;
> (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

11

*Id.* "Trade secret" is:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.*

In its Complaint, the Plaintiff contends that it maintained trade secrets in the form of a "patient list and information which is not generally available to [the Plaintiff's] competitors and the secrecy of which is protected by federal law." (Compl., ¶ 37.) The Plaintiff alleges that its "patient and referral sources list derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable, by proper means by other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (*Id.*) The Complaint alleges that White and Harry "misappropriated [the Plaintiff's] patient list and referral sources by soliciting [the Plaintiff's] patients on [the Plaintiff's] premises, during treatment of the patients by [the Plaintiff], and while White and Harry were employed by and drawing a salary from [the Plaintiff]." (Compl., ¶ 38.)

The allegations of the Plaintiff's complaint, if proven, do not provide an adequate basis for the claim that the Defendants misappropriated its trade secrets in violation of the IUTSA. Although customer lists have in certain circumstances been deemed trade secrets, *see Kozuch v. CRA-MAR Video Ctr., Inc.*, 478 N.E.2d 110, 113–14 (Ind. Ct. App. 1985), the Plaintiff has not alleged that the Defendants misappropriated an actual client list or compilation of some kind. Rather, it claims that the Defendants personally solicited the Plaintiff's patients while they treating them. (An allegation

12

that the Defendants acknowledge states a claim for breach of loyalty in Count 1 of the Complaint.)

*PrimeCare Home Health v. Angels of Mercy Home Health Care, LLC*, 824 N.E.2d 376 (Ind. Ct. App. 2005), is instructive. In that case, the court was not faced with the "typical scenario of an employee taking possession of a compilation of data and utilizing it." *Id.* at 381. Rather, the gravamen of the plaintiff's complaint was that former employees personally solicited patients in their care to become clients of a competing home health care business. *Id.* Under such circumstances, the Indiana Court of Appeals held that the defendants did not violate the IUTSA. *Id.* at 382–83. The court reasoned that the defendants knew the identity of the PrimeCare clients because, as PrimeCare employees, they provided services directly to its clients. *Id.* at 381. Because they had no need to resort to improper means to gain the information, the plaintiff's claim was outside the protection of the IUTSA. *Id.*[1]

The court stated that the circumstances in *PrimeCare* were analogous to *Steevenhoven v. College Life Ins. Co. of Am.*, 460 N.E.2d 973 (Ind. Ct. App. 1984), where a former insurance company employee contacted clients, whose names appeared on a policyholder list, to offer replacement policies with another insurer. *Id.* at 382. In *Steevenhoven*, the Indiana Court of Appeals reasoned that the plaintiff's argument was not that the defendant had disclosed a customer list, but that he had used the list to benefit financially. 460 N.E.2d at 975 n.7; *see also Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 876 (Ind. Ct. App. 1998) (observing that the plaintiff sought to prevent competition by its former agent more than it sought to protect a trade secret). The court held that insofar as the plaintiff attempted to merely restrain the defendant's competition, the IUTSA was an

---

[1] The Court noted that goodwill not statutorily protected could be the subject of a reasonable covenant not to compete. *Id.* at 381–82. However, the employees were employees-at-will and not subject to such any agreement not to compete or covenant not to compete. *Id.* at 382.

improper vehicle. *Id.* ("The fact that Steevenhoven possesses certain knowledge acquired within the course of his employment does not mandate that, upon his departure, Steevenhoven must wipe clean the slate of his memory."). Similarly, in this case, the Defendants did not obtained their knowledge of the Plaintiff's clients by improper means and their knowledge cannot "automatically [be] made a trade secret pursuant to the [IUTSA], without regard to the nature of the information, simply because it can be compiled into a table or list." *Id.*

In response to the Defendants' Motion to Dismiss, the Plaintiff concedes "that the Defendants' knowledge of its customers and referral sources in December 2005 *as it pertained to the Defendants' employment with Physiotherapy* was not a violation of the [IUTSA]." (Resp. at 6). But the Plaintiff argues that the Defendants misappropriated its trade secrets by soliciting its patients, for their own company and benefit, while they were employed by the Plaintiff. (*Id.* at 6–7.) The Plaintiff's argument focuses on the Defendants' use (or misuse) of the client's identities without regard to whether they were actually a protected trade secret. While the Defendants' actions, which the Plaintiff refers to as "misappropriation," may have violated their duty of loyalty, this does not automatically turn their knowledge of the Plaintiff's clients into a protectable trade secret. The Court notes that while the Complaint makes reference not only to the Plaintiff's clients, but to its referral sources, the only claim regarding the referral list is that it too was misappropriated by the Defendants' acts of soliciting the Plaintiff's patients during their treatment. Under no set of circumstances could the Defendants' alleged solicitation state a claim for relief under the IUTSA.

**CONCLUSION AND ORDER**

The Defendants' Motion to Dismiss [DE 8] is GRANTED in PART and Count 2 of the

Complaint for violation of the Indiana Uniform Trade Secrets Act is DISMISSED. The Court withholds ruling on the jurisdictional issue regarding the amount in controversy until after the Court hears additional evidence and argument.

SO ORDERED on March 6, 2006.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT